CERTIFIED COPY

D.C. Clerk
E-FILED
Thursday, 23 June, 2005 11:00:28 AM
Clerk, U.S. District Court, ILCD

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

Argued April 20, 2005
Decided June 20, 2005

FILED
JUN 2 3 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Before

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 04-1349

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>DONALD EDWARDS,<br>*Defendant-Appellant.* | Appeal from the United States District Court for the Central District of Illinois<br><br>No. 02 CR 40143<br><br>Joe Billy McDade,<br>*Judge*. |

ORDER

Police officers found methamphetamine and guns in Donald Edwards' car after a police dog alerted to the car. The district court denied Edwards' motion to suppress the drugs and guns, holding that reasonable suspicion existed to detain Edwards and subject his car to inspection. Edwards presents arguments challenging that conclusion and requests resentencing under *United States v. Booker*, 125 S. Ct. 738 (2005); we uphold the denial of Edwards' suppression motion and order a limited remand under *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), to ask the district court whether it would have imposed the same sentence under an advisory guideline scheme.

Edwards was arrested and charged, as related to this appeal, with one count of possession with intent to distribute at least 50 grams of methamphetamine, 21 U.S.C. § 841(a)(1); one count of carrying a firearm during and in relation to a felony drug trafficking crime, 18 U.S.C. § 924(c); and one count of possession of a firearm by a felon, 18 U.S.C. § 922(g)(1). Edwards moved to suppress the drugs and weapons, arguing that the evidence was obtained during an illegal detention.

No. 04-1349                                                                                     Page 2

    At the evidentiary hearing on the motion to suppress, both the arresting officer, Sgt. Balma, and Edwards testified. Balma testified that on June 4, 2002, he was stationed along I-80 near the Illinois/Iowa border when he saw a red Saturn change lanes without signaling. Balma then initiated a traffic stop, approached the driver's side of the Saturn, and informed Edwards, the driver, of his traffic infraction. Balma noted that Edwards seemed "tense" and his passenger, Doralynn Key, seemed "extremely nervous." Neither would make eye contact with him.

    According to Sgt. Balma, he then asked Edwards to accompany him back to his squad car where Edwards sat in the front passenger seat while Balma examined his documents and engaged him in conversation. During that conversation Edwards informed Balma that he was traveling from Arizona, had dropped off a friend in Joliet, and was on the way to visit his children in Iowa. Edwards added that he planned the trip earlier that same week, had not seen his children in 15 years, and did not know their exact address. After Balma inquired about the duration of his trip, Edwards stated that he intended to stay in Iowa for only one day and then travel to Wisconsin to pick up the passenger he left in Joliet. Balma testified that Edwards remained nervous and had difficulty answering some of the questions put to him during their conversation.

    While Edwards waited in the squad car, Sgt. Balma went back to the Saturn to speak to Key. Balma testified that, when he asked Key for details of her trip with Edwards, her story differed in that she said the next leg (after visiting Edwards' children in Iowa) would be a return to Joliet, not to Wisconsin. Key, Balma testified, was "very, very upset" and "very, very nervous"; she avoided eye contact and appeared to be "on the brink of almost crying." Balma asserted that, based on his experience with drug interdiction, the long trip with a short turn-around time was indicative of drug courier activity. Moreover, he stated that Edwards' Arizona license plate suggested a drug connection because Arizona is known as a "source" state for narcotics, and Chicago and Joliet are well-known drug distribution points.

    Sgt. Balma returned their documents to Edwards and Key, issued Edwards a written warning, and advised him he was free to go. But before Edwards left, Balma requested consent to search the car; Edwards refused. Balma then told Edwards he was calling a canine officer to walk a dog around the Saturn.

    According to Sgt. Balma, the canine unit arrived in ten minutes, and the dog, Viper, was walked around the Saturn. Viper "alerted" near the front of the car, and when questioned, Edwards revealed that he had $18,000 cash in the car. Balma opened the trunk, searched inside, and found a gun in a toiletry bag. Meanwhile,

No. 04-1349                                                                                          Page 3

the canine officer searched the passenger compartment and found another gun and a plastic bag containing methamphetamine.

At the suppression hearing Edwards disputed several aspects of Sgt. Balma's testimony. First, he testified that the only information he provided Balma about the nature of his trip was that he and Key "just came from Joliet, stopped at the casino, and were on their way to Iowa" to see his children. Edwards also insisted that Balma did not return his driver's license, or tell him he was free to go. Finally, Edwards asserted that he was not nervous at all when being questioned by Balma.

The district court denied Edwards' motion to suppress, reasoning that Edwards was lawfully detained because Sgt. Balma articulated factors sufficient for reasonable suspicion. After a second suppression motion unrelated to this appeal, a jury found Edwards guilty on the drug count, one of the § 924(c) counts, and the § 922(g)(i) count. The court sentenced Edwards to a total of 248 months' imprisonment, the low end of the guideline range.

In this appeal, Edwards principally challenges the denial of his first motion to suppress. He contends that the methamphetamine and guns recovered from his car were illegally obtained because Sgt. Balma lacked reasonable suspicion to continue holding him after the traffic stop.

We review the district court's legal conclusions de novo and its factual findings for clear error, giving special deference to the district court's credibility choices. *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). To expand a traffic stop beyond its initial purpose, or to further detain a person after a stop is completed, an officer must have reasonable suspicion of criminal activity, *see United States v. Finke*, 85 F.3d 1275, 1280-81 (7th Cir. 1996), based on "specific, articulable facts," *United States v. Walden*, 146 F.3d 487, 490 (7th Cir. 1998). Reasonable suspicion is determined by considering the totality of the circumstances of the encounter. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Jackson*, 300 F.3d at 745.

Sgt. Balma articulated a number of factors that made him suspicious of Edwards and Key: (1) they were nervous, and their nervousness did not abate as the stop progressed; (2) Edwards purportedly was on his way to visit children he had not seen in 15 years at an address he did not know; (3) the pair had planned the trip just days before they left and had a quick turnaround time; (4) they did not agree on their itinerary; and (5) they were traveling from a drug source state to a drug distribution city. None of these factors would give rise to reasonable suspicion standing alone, and the last of them adds virtually nothing. A significant portion of the nation's population lives in so-called drug source or destination cities and states, among them New York and New Jersey, cities throughout Florida and

Texas, Chicago and Detroit, and virtually the entire western part of the country. *United States v. Beck,* 140 F.3d 1129, 1138 n.3 (8th Cir. 1998). The label is now so ubiquitous that travel to or from these destinations can no longer reasonably suggest a greater likelihood of involvement in drug trafficking than any other interstate travel. *See United States v. Santos,* 403 F.3d 1120, 1132 (10th Cir. 2005) (characterizing drug source and destination factor as "weak"); *United States v. Vite-Espinoza,* 342 F.3d 462, 468 (6th Cir. 2003) (acknowledging that drug-source city rationale is "long-discredited"); *United States v. Salzano,* 158 F.3d 1107, 1114 (10th Cir. 1998) (explaining that mere fact of travel from a source state is not sufficient to support reasonable suspicion); *Beck,* 140 F.3d 1129 at 1137-38, 1139 (fact of travel from "source state" is insignificant factor); *but cf. United States v. Foreman,* 369 F.3d 776, 785 (4th Cir. 2004) (holding that travel between New York City and southeastern Virginia, combined with other factors, established reasonable suspicion.). If that were all Sgt. Balma had to go on, the district court's ruling might not be sustainable.

But Sgt. Balma cited additional factors that contributed significantly toward his decision to detain Edwards, and inferences by law enforcement officers are entitled to deference when a court analyzes whether a totality of circumstances existed to support reasonable suspicion. *Arvizu,* 534 U.S. at 276; *Finke,* 85 F.3d at 1280. Among his concerns were the inconsistencies in the stories told by Edwards and Key, and the dubious nature of their travel plans. Not only did the two disagree about the next leg of their journey, but the rationale for the trip was unusual, as was the fact that Edwards had planned such a long journey only a few days earlier. *See United States v. Townsend,* 305 F.3d 537, 543 (6th Cir. 2002) (recognizing that lying about travel plans can support reasonable suspicion); *United States v. Zubia-Melendez,* 263 F.3d 1155, 1162 (10th Cir. 2001) (explaining that implausible or contradictory plans can contribute to reasonable suspicion); *United States v. Kopp,* 45 F.3d 1450, 1453-54 (10th Cir. 1995) (upholding conclusion that cross-country trip to deliver dilapidated sofa was suspicious). Balma also noted that Edwards and Key were very nervous (Key at one point was on the verge of tears), would not make eye contact, and Edwards had difficulty answering the questions put to him. Extraordinary or increasing nervousness can contribute to a finding of reasonable suspicion, as can failure to make eye contact. *Santos,* 403 F.3d at 1127; *United States v. Brown,* 188 F.3d 860, 865 (7th Cir. 1999). Finally, the quick turnaround nature of the trip is characteristic of drug courier activity. *See Finke,* 85 F.3d at 1280 (upholding finding that driving to and from California in five days contributed to reasonable suspicion). Like the district court, we conclude that all of these factors together established reasonable suspicion. *See United States v. Gonzalez,* 328 F.3d 755, 758 (5th Cir. 2003) (upholding finding of reasonable suspicion where driver with prior arrest for drug trafficking lied about his driver's license, gave inconsistent stories, acted very nervous, hesitated in answering questions, and offered implausible explanation for his presence on a remote road

No. 04-1349 Page 5

associated with drug trafficking); *United States v. Hill*, 195 F.3d 258, 271-72 (6th Cir. 1999) (holding that driver's implausible explanation for cross-country trip, inconsistent statements regarding trip, nervous demeanor, and possible use of cocaine established reasonable suspicion); *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (upholding finding of reasonable suspicion where truck driver who claimed to be making delivery did not know exact address of delivery destination, had rented truck with cash, offered implausible and inconsistent statements about his cargo, and had a ham radio, laser detector and radar detector).

What is left is *Booker*. Edwards never presented this issue to the district court, and thus our review is for plain error. *See Paladino*, 401 F.3d at 483. Mandatory application of the guidelines violates *Booker*, and unless we can be certain from the record that the district court would have imposed the same sentence under the now-advisory guidelines, *Paladino* requires a limited remand to ask the district court what it would have done under an advisory system, *id.* at 483-84. In this case, the district court gave no indication why it sentenced Edwards to the low end of the guideline range, nor did it make any comments or statements on the mandatory nature of the guidelines. Thus, it is difficult for us to be certain how the district court would have proceeded had it known the guidelines were not mandatory. Accordingly, we order a limited remand, while retaining jurisdiction, to ask the district court whether it would have imposed the same sentence under an advisory regime.

A True Copy:
Teste:

Clerk of the United States Court of Appeals for the Seventh Circuit.