**E-FILED**
Thursday, 22 December, 2005  04:08:33 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT ROCK ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Criminal No. 02-40143** |
| | ) | |
| **DONALD F. EDWARDS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**THE UNITED STATES OF AMERICA'S
<u>POSITION ON PREVIOUSLY IMPOSED SENTENCE</u>**

NOW COMES the United States of America, by its attorneys, Rodger A. Heaton, United

States Attorney for the Central District of Illinois, and John K. Mehochko, Assistant United States

Attorney, and hereby states its position with regard to the sentence previously imposed:

**I. <u>Introduction</u>**

On February 5, 2004, this Court sentenced the defendant, Donald Edwards, to a total of 248

months of imprisonment. Defendant filed a notice of appeal on February 5, 2004.  On January 12,

2005, while this case was still on direct appeal, the United States Supreme Court issued its opinion

in *United States v. Booker*, 125 S.Ct. 738 (2005). On June 23, 2005, the United States Court of

Appeals for the Seventh Circuit affirmed the defendant's conviction, but retained jurisdiction of

the appeal and ordered a limited remand of the defendant's sentence pursuant to the procedures set

forth in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

The purpose of the limited remand under *Paladino* is to allow this Court to determine

whether it would reimpose its original sentence, if required to resentence. *Id.* at 484. On

November 10, 2005, implementing the *Paladino* procedures, this Court ordered the parties to state

their respective positions as to whether this Court should adhere to the original sentence now that

the Sentencing Guidelines are advisory. The United States asserts that the original sentence

imposed by this Court was both appropriate and reasonable and that this Court should adhere to

the original sentence.

## II.    Procedural History[1]

On June 4, 2002, the defendant's car was stopped by the Illinois State Police in Rock

Island County for a traffic violation. The trooper noted, among other things, that both the

defendant and Key were extremely nervous and fidgeting, and would not make eye contact with

the trooper. (Supp.Tr.13-14,36-37, 95-96) The trooper asked separated the defendant and Key and

asked them about their travel plans; the two gave inconsistent accounts of their travel.

(Supp.Tr.14-15, 17-18) In addition, the defendant gave the trooper a bizarre explanation for his

travel, claiming that he and Key were now on their way to his children's house in the Clinton,

Iowa, area. (Supp.Tr.15) Balma asked the defendant when he had planned the trip, and the

defendant said that he had planned it earlier in the week. (Supp.Tr.15) Upon further questioning,

Balma learned that the defendant's children did not know that he was coming, and that the

defendant did not know where the children lived, because he had not seen them in 15 years.

(Supp.Tr.15) Balma asked the defendant how long he was planning to be in Clinton to visit his

children, and the defendant replied "one day." (Supp.Tr.15) Balma noticed that as he was talking

to the defendant about the details of the trip, the defendant became increasingly more nervous, that

---

[1]   References to the transcript of the trial are to "Tr._"; references to the transcript of the
first suppression hearing are to "Supp.Tr._"; references to the transcript of the second
suppression hearing are to "Supp.Tr.II_"; references to documents in this Court's record are to
the docket number on the docket sheet, *e.g.,* "R._"; references to the docket entries in the record
are to "d/e __"; references to entries in the appellate record are to "#04-1349."

his answers to the questions did not appear to be natural, and that he seemed to have trouble responding to the more detailed questions. (Supp.Tr.19-20)

Based on Balma's extensive drug interdiction training and experience, he knew that the type of trip described by Key and the defendant – a long distance trip combined with a short turnaround time before returning back to the destination – was a common practice for drug couriers. (Supp.Tr.18-19) In addition, Balma's training and experience told him that although it is a natural reaction for a motorist to be nervous when pulled over by the police, that nervousness usually subsides unless there is other criminal activity afoot. (Supp.Tr.95-96)

After Balma finished completing the written warning for the defendant's traffic violations, he requested that a canine unit respond to the scene of the traffic stop. (Supp.Tr.22) When the dog handler walked the canine around the defendant's car, it alerted to the presence of the odor of narcotics. (Supp.Tr.25-26) When the troopers searched the defendant's car, they found $18,000 in cash, a plastic cup on the front passenger floor area. (Supp.Tr.27) Balma returned to the defendant's car, where Key was still seated, and told her to give him the money. (Supp.Tr.27-28) Key handed Balma the plastic cup. Inside the cup, Balma and Fratzke found $18,000 in cash, a loaded 9 mm handgun, a loaded .22 revolver, and approximately 75 grams of methamphetamine. (Supp.Tr.27-30)

### First Suppression Hearing

The defendant filed a motion to suppress the evidence recovered from his car.   This court denied that motion to suppress, finding that the traffic stop was legitimate and that the defendant had committed the traffic violations alleged. (Supp.Tr.171-75) This court specifically found that the defendant's testimony at the suppression hearing was not credible.  (Supp.Tr.171-72)

3

**Second Suppression Hearing**

On March 24, 2003, the defendant filed another motion to suppress, this time pursuing an argument he had abandoned in the first motion to suppress: that his post-arrest statements should be suppressed. (R.27) At the motion hearing, the defendant testified that he had been physically abused by two agents of the Quad City Metropolitan Enforcement Group ("QCMEG") during his post-arrest questioning. (Supp.Tr.II.15-18) Among other things, the defendant testified that when he told the agents that he was not going to answer any questions, "They said okay. They said stand up. I stood up and then they grabbed my arms and put them behind my back and kept elevating my arms until I was on my face on the table. . . . They had - - there was one on each arm and they had me down. I was on my tip toes . . . ." (Supp.Tr. II.15-17)

After the alleged abuse, the defendant claimed that the agents told him to "just fill out these forms. Answer my [sic] questions." (Supp.Tr.II.15) He claimed that he spoke to the agents because "They have me, my arms in positions that they are not supposed to go in. I felt that if I didn't answer questions, they'd either physically abuse me or go back - - and apparently that's why they had her [the defendant's girlfriend] crying." (Supp.Tr.II.18) The defendant stated that because of the alleged physical abuse from the agents, he did not feel that he had any choice but to sign the *Miranda* waiver form. (Supp.Tr.II.43)  Despite this alleged abuse, the defendant did not admit that the drugs in the car belonged to him. In fact, the defendant denied that it was methamphetamine at all; instead, he claimed that he had emptied part of a box of Epsom salts into a similar plastic baggie, and that the baggie of Epsom salts was what the officers had found in the back seat of his car. (Supp.Tr.II.84-85)

The district court denied the defendant's motion to suppress his statements, finding that his

4

claim of abuse was completely incredible: "The Court does not believe that there was any physical abuse of the defendant as he testified to." (Supp.Tr.II.134)

On September 29, 2003, the case proceeded to a trial by jury. After a three-day jury trial, the defendant was convicted on the three drug and firearms counts submitted to the jury. (Tr.344)

**Sentencing Hearing**

On February 5, 2004, a sentencing hearing was held. (Sent.Tr.1) The court heard arguments on whether the defendant had obstructed justice by committing perjury at the hearing on the motion to suppress statements, and found that the enhancement was appropriate because he had indeed committed perjury when he testified that the QCMEG agents physically abused him. (Sent.Tr.17-22,24)    The court adopted the PSR's factual findings and guideline application, but refused to convert the $18,000 found in the defendant's car into an equivalent amount of methamphetamine for purposes of calculating the base offense level. (Sent.Tr.17,22) The court determined that the proper base offense level was level 32. (Sent.Tr.22; USSG, Ch. 5, Part A) The court determined that when the two-level enhancement for obstruction of justice was applied, the defendant's total offense level was 34. (Sent.Tr.22) Offense level 34 combined with the criminal history category III yielded a guideline imprisonment range of 188 to 235 months, plus a mandatory consecutive sentence of 60 months for Count II, the 18 U.S.C. § 924(c) charge. (Sent.Tr.22)

The district court sentenced the defendant to 188 months of imprisonment on Count I, with a consecutive 60-month sentence on Count II. (Sent.Tr.28) The court also imposed a 120-month sentence of imprisonment on Count IV, concurrent with Count I. (Sent.Tr.28-29) The court sentenced the defendant to concurrent five-year supervised release terms on all counts.

5

(Sent.Tr.29) The defendant was also ordered to pay a $1,500 fine and a $300 special assessment.

(Sent.Tr.29,30) The defendant immediately filed a Notice of Appeal. (R.81)

### Appeal

On August 25, 2004, the defendant filed his initial brief with the Court of Appeals.  The

issues raised were: 1) whether this Court committed error in denying the defendant's motion to

suppress evidence, and 2) whether the defendant was sentenced in violation of the Sixth

Amendment, and pursuant to *Blakely v. Washington* and *United States v. Booker,* when this Court

applied the various Guideline sentencing enhancements based upon facts not admitted by the

defendant or found by a jury.

On June 23, 2005, the United States Court of Appeals for the Seventh Circuit upheld the

denial of defendant's suppression motion, but retained jurisdiction of the appeal and ordered a

limited remand of the defendant's sentence pursuant to the procedures set forth in *United States v.*

*Paladino*, 401 F.3d 471 (7th Cir. 2005).

### III.    Procedure on Remand

The Seventh Circuit has observed that  28 U.S.C. § 2106 [2] "grants appellate courts

flexibility in determining the scope of [a] remand." *United States v. White*, 406 F.3d 827, 831 (7th

Cir. 2005). In the sentencing context, the statute authorizes the Court of Appeals to limit a remand

to specific issues. *Id.* (citing *United States v. Young*, 66 F.3d 830, 835 (7th Cir. 1995)). In *White*,

---

[2] Title 28 U.S.C. § 2106 states:
The Supreme Court or any other court of appellate jurisdiction may affirm,
modify, vacate, set aside or reverse any judgment, decree, or order of a court
lawfully brought before it for review, and may remand the cause and direct the
entry of such appropriate judgment, decree, or order, or require such further
proceedings to be had as may be just under the circumstances.

the Court described the role of district courts when a case is remanded:

> Both the law of the case doctrine and the mandate rule require the district court to adhere to the commands of this Court. *See United States v. Husband*, 312 F.3d 247, 250 n.3 (7th Cir. 2002) . . . . The scope of a district court's power on remand is determined by the language of the order of remand. *United States v. Buckley*, 251 F.3d 668, 669 (7th Cir. 2001).

*Id.* Thus, the scope of the remand in this case is determined by the Seventh Circuit's June 20, 2005, order, which called for a limited remand pursuant to the procedures set forth in *Paladino*.

In *Paladino*, the Seventh Circuit set forth its approach to *Booker* plain errors. The Court first found that, in cases in which a district judge imposed a mandatory Guidelines sentence, there was error and the error was plain. 401 F.3d at 481. It then observed that, in assessing whether the error affected the defendant's substantial rights, the reviewing court will seldom be able to tell, based on the record before it, what the district court would have done had the objection been brought to its attention at the proper time. *Id.* at 483-84. The Court concluded that, where it cannot be determined from the existing record whether the district judge would have imposed the same sentence under an advisory system, the Court of Appeals would retain jurisdiction of the appeal and order a limited remand to permit the sentencing judge to determine whether he or she would, if required to resentence, reimpose the original sentence. *Id.* at 484.

*Paladino* sets forth the specific procedural requirements on remand:

> . . . the District Court should obtain the views of counsel, at least in writing, but "need not" require the presence of the Defendant, *see* Fed.R.Crim.P. 43(b)(3). Upon reaching its decision (with or without a hearing) whether to resentence, the District Court should either place on the record a decision not to resentence, with an appropriate explanation, . . . or inform this court of its desire to resentence the defendant.

*Id.* at 484 (quoting *United States v. Crosby*, 397 F.3d 103, 120 (2nd Cir. 2005)).

Thus, while this Court must solicit the views of counsel, as it is doing, the Court of

Appeals does not contemplate an evidentiary hearing, or any other type of hearing that goes

beyond the established record or the limited purpose of the remand. Rather, this Court's decision

should be based on the existing record, which includes the Presentence Investigation Report, the

evidence and arguments presented at the trial and at the sentencing hearing, and the written views

of counsel regarding resentencing. Indeed, the Seventh Circuit has made it clear that on remand a

sentencing court should consider only those facts that were known at the time the original sentence

was imposed; post-sentencing events, such as post-sentencing rehabilitation, should not be

considered. *United States v. Welch*, 429 F.3d 702, 705-706 (7th Cir. 2005) ("The district court

properly limited its review during *Paladino* remand to the record at the time of sentencing.  We

agree with the district court that while Welch's efforts post-sentencing to prepare for life outside

prison are commendable, such actions are not appropriate for consideration during a *Paladino*

remand.") (citations omitted); *United States v. Re*, 419 F.3d 582, 583 (7th Cir. 2005) (on *Paladino*

remand, "Post-sentencing events or conduct simply are not relevant").[3]

It is also clear from *Paladino* that, should this Court hold a hearing, the presence of the

defendant is not required. 401 F.3d at 484. A defendant's presence is not required when the

proceeding involves only a conference or a hearing on a question of law. Fed.R.Crim.P. 43(b)(3).

Here, the question is limited to the application of a new rule of law announced by the Supreme

Court. Post-*Paladino*, the Seventh Circuit has reiterated its view that the defendant need not be

present at the remand stage. *United States v. Henningsen*, 402 F.3d 748, 751 (7th Cir. 2005) ("The

---

[3]  Thus, the defendant's references to his post-sentencing conduct, and his claims to be a "model prisoner," Def.Br. p. 12-13 and Ex. A, are inappropriate on a *Paladino* remand and should not be considered by the Court.

district judge should solicit the views of counsel in reaching his decision, but [the defendant] need

not be present at this stage").

     *Paladino* instructs district courts to inform the Court of Appeals if resentencing is desired,

in which case the Court of Appeals will vacate the sentence and remand the matter to the district

court for resentencing. 401 F.3d at 484. If, on the other hand, this Court determines that it would

reimpose the same sentence, it must so state on the record and explain its reasons. *Id*. In that event,

the Court of Appeals will affirm the original sentence against a plain-error challenge, provided that

it is reasonable. *Id.*

## IV.    Legal Framework

     *Booker* held that the Sentencing Guidelines are no longer mandatory.  However, the

Guidelines still play a vital role in sentencing.  Sentencing courts must consider the Guidelines

before imposing sentence. *Booker*, 125 S.Ct. at 767.  Moreover, as the Seventh Circuit has

observed, the Guidelines maintain a position at the heart of the sentencing process:

> The Sentencing Guidelines represent at this point eighteen years'
> worth of careful consideration of the proper sentence for federal
> offenses. When the Supreme Court directed the federal courts to
> continue using the Guidelines as a source of advice for proper
> sentences, it expected that many (perhaps most) sentences would
> continue to reflect the results obtained through an application of the
> Guidelines. . . . [A] clean slate that ignores the proper Guidelines
> range would be inconsistent with the remedial opinion. As *Booker*
> held, "the district courts, while not bound to apply the Guidelines,
> must consult those Guidelines and take them into account when
> sentencing." The Guidelines remain an essential tool in creating a
> fair and uniform sentencing regime across the country.

*United States v. Mykytiuk*, 415 F.3d 606, 607-08 (7th Cir. 2005) (citations omitted).

     As a result of the continued vitality of the Guidelines, albeit in a new role, the Seventh

Circuit has stated, "any sentence that is properly calculated under the Guidelines is entitled to a

rebuttable presumption of reasonableness." *Id.* at 608. "The defendant can rebut this presumption

only by demonstrating that his or her sentence is unreasonable when measured against the factors

set forth in § 3553(a)." *Id.* This is a difficult burden to overcome, since 18 U.S.C. § 3553(a) simply

requires the Court to consider many of the same factors that are already taken into account by the

Guidelines: the nature and circumstances of the offense, the history and characteristics of the

defendant, and the need for the sentence imposed to reflect the seriousness of the offense, promote

respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and

protect the public from further crimes of the defendant. Thus, the Seventh Circuit has stated that it

"fully expect[s] that it will be a rare Guidelines sentence that is unreasonable." *Id.; see also United*

*States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005) ("'When the judge exercises her discretion to

impose a sentence within the Guideline range and states for the record that she is doing so, little

explanation is required'")(quoting *United States v. Mares*, 402 F.3d 511, 519 (5th Cir 2005)).

## V.    The Sentence Imposed Was Appropriate and Reasonable

The sentence imposed in this case was both appropriate and reasonable. At sentencing, this

Court heard arguments on whether the defendant had obstructed justice by committing perjury at

the hearing on the motion to suppress statements, and found that the enhancement for obstruction

of justice was appropriate because he had indeed committed perjury when he testified that the

QCMEG agents physically abused him. This Court determined that when the two-level perjury

enhancement for obstruction of justice was applied, the defendant's total offense level was 34.

(Sent.Tr.22) Offense level 34 combined with the criminal history category III (based upon the

defendant's 4 criminal history points) yielded a guideline imprisonment range of 188 to 235

months, plus a mandatory consecutive sentence of 60 months for Count II, the 18 U.S.C. § 924(c)

charge. The district court sentenced the defendant to 188 months of imprisonment on Count I, with a consecutive 60-month sentence on Count II.

In fact, the defendant's 4 criminal history points actually significantly under-represented the defendant's true criminal history, a fact the probation officer noted in paragraph 97 of the PSR in concluding that there was a basis for an upward departure for under-representation of criminal history. *See also* PSR ¶¶ 29-37 (criminal history points assigned for only 2 of 9 of defendant's convictions); 39-51 (extensive listing of other criminal conduct by defendant); 57 (defendant's sexual and physical abuse of family members).  The government did not seek, and the Court did not impose, an upward departure in this case, but the defendant's lifelong pattern of violating the law, and his consistent failure to accept any responsibility for these criminal acts, is an important factor for the Court to consider and compels the conclusion that the defendant will pose a significant risk of recidivism and continuing his life of crime upon release.  In light of such under-representation, a further reduction in the defendant's sentence is not appropriate.

Moreover, an additional factor not taken into account in calculating the defendant's guideline range was his threat to kill his lawyer, Mr. Petro, if Petro lost the defendant's case.  PSR ¶ 14 (defendant told Petro "If you lose this case you ain't going to be around anymore," and noting that threat could be a basis for higher sentence within guideline range).  This Court allowed Mr. Petro to withdraw after the threat was made, however, the defendant did not receive an additional obstruction of justice enhancement for this threat.

In addition, the Government argued that the $18,000 in cash seized from the defendant ought to be converted to an equivalent amount of methamphetamine.  However, the Court adopted the defendant's view that the base offense level should be based upon the drugs seized, not

11

speculation about whether the $18,000 consisted of further methamphetamine proceeds. PSR ¶ 10 and p.23-24.

The defendant, still refusing to accept responsibility, seeks to distinguish his possession of the methamphetamine and the loaded handguns as simply "constructive," pointing out that fingerprints were not recovered from the drugs or the guns. Def.Br. p. 10; PSR ¶¶ 7-8 (defendant claimed he had possessed Epsom salts, not methamphetamine, and that guns belonged to girlfriend, not him).  Whether the defendant's fingerprints were lifted from the contraband is irrelevant; the jury's verdict established that the defendant possessed the 75 grams of methamphetamine in this case with the intent to distribute it to others, and that he carried (and did not simply possess) the two loaded handguns during and in furtherance of that drug trafficking crime.

In imposing a sentence within the Guideline range, and at the lower-end of that range, this Court took into account the aggravating factors identified above, as well as the findings of the jury. The sentence imposed by the Court in this case was both fair and uniform with other sentences imposed upon similarly situated offenders who possessed an equal amount of methamphetamine, and fairly accounted for the aggravated nature of the defendant's crime.  Moreover, since the sentence was within the properly calculated Guideline range, it is entitled to a rebuttable presumption of reasonableness.

The defendant cannot rebut the presumption. In this case, the nature and circumstances of the offense, and history and characteristics of the defendant, support the sentence imposed by this Court.  Likewise, the sentence received by the defendant reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and will

protect the public from further crimes of the defendant.  None of the factors contained in § 3553(a)

dictate a different sentence under an advisory Guidelines system. The original sentence of

imprisonment imposed by this Court remains both appropriate and reasonable.

## CONCLUSION

WHEREFORE the United States of America respectfully requests that this Court adhere

to the original sentence imposed in this case as both appropriate and reasonable.

Respectfully submitted,

RODGER A. HEATON
UNITED STATES ATTORNEY

/s/ John K. Mehochko
John K. Mehochko
Assistant United States Attorney
1830 Second Avenue, Third Floor
Rock Island, Illinois  61201
Telephone (309) 793-5884

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2005, I faxed the foregoing to the following:

Charles J. Biro.

/s/ John K. Mehochko
JOHN K. MEHOCHKO
ASSISTANT U.S. ATTORNEY